NOTE: This disposition is nonprecedential

# United States Court of Appeals for the Federal Circuit

---

**STAMPS.COM INC.,**
*Plaintiff-Appellant,*

v.

**ENDICIA, INC. AND PSI SYSTEMS, INC.,**
*Defendants-Appellees.*

---

2010-1328

---

Appeal from the United States District Court for the Central District of California in case no. 06-CV-7499, Judge Otis D. Wright II.

---

Decided: June 15, 2011

---

PHILIP J. GRAVES, Graves & Walton LLP, of Los Angeles, California, argued for plaintiff-appellant. With him on the brief was MARJORIE A. WITTER. On the brief was FLAVIO M. ROSE, Irell & Manella LLP, of Los Angeles, California. Of counsel on the brief was SETH D. WEISBERG, Stamps.com, Inc., of Los Angeles, California.

GREGORY A. LONG, Sheppard Mullin Richter & Hampton LLP, of Los Angeles, California, argued for defen-

dants-appellees. With him on the brief were GARY A. CLARK and DENNIS J. SMITH.

––––––––––––

Before BRYSON, DYK, and Prost, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK. *Circuit Judge* BRYSON concurs-in-part and dissents in part.

DYK, *Circuit Judge*.

Stamps.com, Inc. ("Stamps.com") appeals a decision of the United States District Court for the Central District of California granting summary judgment of invalidity with respect to fifteen claims of eight patents. *Stamps.com, Inc. v. Endicia, Inc.*, No. CV 06-7499 (C.D. Cal. Nov. 9, 2009). We affirm.

BACKGROUND

Stamps.com and Endicia, Inc. ("Endicia") are competing providers of Internet postage. On November 22, 2006, Stamps.com filed suit against Endicia, alleging infringement of 629 claims of eleven patents owned by Stamps.com. Endicia filed a counterclaim for a declaratory judgment of non-infringement and invalidity. On March 17, 2008, the district court granted Endicia's motion to limit the number of asserted claims. The district court ordered the parties to "limit[ ] the number of asserted claims to fifteen," but stated that it "w[ould] remain flexible if plaintiffs [sic] show[ed] good cause for additional claims." Order Granting Mot. To Limit the Number of Asserted Claims of the Patents-in-Suit, *Stamps.com, Inc. v. Endicia, Inc.*, No. CV 06-7499 (C.D. Cal. Mar. 17, 2008). After some dispute about the number of claims that should be considered for expert discovery, the parties eventually filed *Markman* briefs limited to the fifteen claims selected by Stamps.com. The district court

eventually construed ten claim terms in fifteen claims from seven patents. Three of these claim terms were part of means-plus-function claims.

The eight patents-in-suit generally comprise four groups of technologies:

a. U.S. Patent Nos. 5,812,991 ("'991 patent"), 6,249,777 ("'777 patent"), and 6,889,214 ("'214 patent") pertain to systems and methods for purchasing, transferring, and storing postage value over a secure computer network.

b. U.S. Patent No. 6,233,568 ("'568 patent") discloses a system that allows users to compare the postage rates of multiple services, such as the United States Postal Service ("USPS") and FedEx.

c. U.S. Patent Nos. 5,717,597 ("'597 patent) and 6,208,980 ("'980 patent") teach the printing of postage value and graphics, such as company logos or birthday messages, on envelopes and labels.

d. U.S. Patent Nos. 6,965,451 ("'451 patent") and 6,982,808 ("'808 patent") describe algorithms that help standard printers reliably print stamps and other graphics near the edge of an envelope.

After the parties filed cross-motions for summary judgment, the district court granted summary judgment for Endicia, holding claims 13, 50, and 89 of the '214 patent anticipated; claim 23 of the '568 patent indefinite; and the remaining eleven claims obvious over a combination of various items of prior art. The district court's conclusions are summarized in the table below:

| Patent | Filing Date | Asserted Claims | Relevant Prior Art |
|--------|-------------|-----------------|--------------------|

| | | | |
|---|---|---|---|
| '991 patent | October 2, 1996 | 7, 42, 76 | **Obvious**: Whitehouse '562 patent; Tygar-Yee article |
| '777 patent | July 15, 1998 | 3, 50, 63 | **Obvious**: Lewis '565 patent; Tygar-Yee article |
| '214 patent | August 23, 2000 | 13, 50, 89 | **Anticipated**: Ogg-Chow '406 patent |
| '568 patent | June 29, 1998 | 23 | **Indefinite** |
| '597 patent | October 11, 1995 | 7 | **Obvious**: Whitehouse '562 patent; DAZzle |
| '980 patent | November 5, 1997 | 35 | **Obvious**: DAZzle |
| '451 patent | August 30, 1999 (provisional application) | 17 | **Obvious**: Microsoft Word for Windows 95; DAZzle; |

| | | | |
|---|---|---|---|
| | | | AddressMate for Windows v2.15 |
| '808 patent | August 30, 1999 (provisional application) | 32, 39 | **Obvious**: Microsoft Word for Windows 95; DAZzle; AddressMate for Windows v2.15 |

A brief description of each prior art reference follows:

**a. Whitehouse '562 Patent:**  Endicia's U.S. Patent No. 5,319,562 ("Whitehouse '562 patent") is titled "System and Method for Purchase and Application of Postage Using Personal Computer."  The patent was filed on August 22, 1991, by Harry Whitehouse.  The Whitehouse '562 patent teaches a system in which users can use their personal computers ("PCs") to communicate with a computer at the postal authority over a modem.  The Whitehouse '562 patent was asserted prior art against the '991 and '597 patents.

**b. DAZzle Software:**  Endicia's DAZzle software program ("DAZzle") is a software program that has been offered for sale, sold, and distributed by Endicia since 1991, including the DAZzle Designer (1997) and the DAZzle User's Guide version 2.5 (1992-1995).  The earliest version of DAZzle was copyrighted no later than 1992.  The software enabled users to create and print addresses, graphics, and bar codes on envelopes from their com-

puters. The DAZzle software and user guide were asserted as prior art against the '597, '980, '451, and '808 patents.

**c. Tygar-Yee Article:** On March 1, 1993, J.D. Tygar and Bennet Yee coauthored a paper entitled "Cryptography: It's Not Just for Electronic Mail Anymore," CMU-CS-93-107 ("Tygar-Yee" article). J.A. 9584. This paper described a PC-based network to enable remote users to access and print postage from an account. This account could be replenished via a secure online transaction with the USPS. The Tygar-Yee article was asserted as prior art against the '991 and '777 patents.

**d. Lewis '565 Patent:** Defendant's U.S. Patent No. 6,233,565 ("Lewis '565 patent") was filed on February 13, 1998. The patent teaches "[a] system and methods for conducting Internet based financial transactions between a client and a server" wherein "the client issues a transaction request to the server and the transaction server, in response to a client transaction request, executes an electronic payment transaction at the server." Lewis '565 patent, at [57]. The Lewis '565 patent was asserted as prior art against the '777 patent.

**e. Ogg-Chow '406 Patent:** U.S. Patent No. 6,868,406 ("Ogg-Chow '406 patent") was filed on October 16, 2000, and is assigned to Stamps.com. The patent is titled, "Auditing Method and System for an On-Line Value-Bearing Item Printing System." The Ogg-Chow '406 patent was asserted as prior art against the '214 patent.

**f. Microsoft Word for Windows 95 ("Word 95"):** Word 95 is a word processing program that allows users to print and preview envelopes and labels. Word 95 was asserted as prior art against the '451 and '808 patents.

**g. AddressMate for Windows v2.12 ("Address-Mate"):** AddressMate is a software program that attaches to word processing programs. This program helps users manage their address books, merge addresses into documents, and print addresses and barcodes onto envelopes and labels. AddressMate was asserted as prior art against the '451 and '808 patents.

Following summary judgment, Stamps.com moved to pursue additional claims beyond the fifteen claims that were the subject of the summary judgment motion. The district court implicitly denied this motion when it entered judgment for Endicia.

Stamps.com timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). Anticipation is a question of fact, *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999), and obviousness is a question of law based on underlying facts, *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). A grant of summary judgment of invalidity on grounds of indefiniteness is also a question of law, which we review de novo. *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1328 (Fed. Cir. 2005). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Immunocept, LLC v. Fulbright & Jaworski LLP*, 504 F.3d 1281, 1286 (Fed. Cir. 2007).

## DISCUSSION

The district court in large part did a careful and thorough job reviewing the patents-in-suit, and it correctly concluded that the asserted claims were indefinite, anticipated, or rendered obvious over a combination of prior art. In light of the district court's thorough opinion, we need not explicitly address every one of the many issues raised by the patentee on appeal.

I

Stamps.com argues that the district court abused its discretion in refusing to grant its motion to pursue additional claims beyond the litigated fifteen claims. Even though Stamps.com conceded the court's authority to impose a limit on the number of claims, it contends that the district court's denial of its motion to pursue additional claims violates its due process rights because a subsequent suit against Endicia on the remaining claims could be barred by res judicata. Recently, in *In re Katz Interactive Call Processing Litigation*, --- F.3d ---, 2011 WL 607381, at *2–3 (Fed. Cir. Feb. 18, 2011), we held that limiting a plaintiff patentee to sixty-four claims from a large number of asserted claims was permissible if the district court left open the door for the assertion of additional claims on a showing of need. Where the patentee "did not file a motion to add claims with the requisite showing of need," it "cannot legitimately complain that it did not have a meaningful opportunity to be heard." *Id.* at *4 (internal quotation marks omitted). Here, as in *Katz*, the district court's order to limit the claims was not immutable. The district court clearly stated that it would "remain flexible if plaintiffs [sic] show[ed] good cause for additional claims." Order Granting Mot. To Limit the Number of Asserted Claims of the Patents-in-Suit, *Stamps.com, Inc. v. Endicia, Inc.*, No. CV 06-7499 (C.D. Cal. Mar. 17, 2008). The district court also stated that, "[i]f it can be demonstrated . . . that [fifteen claims] is absolutely unworkable, then we will discuss [number sixteen]. If necessary, we will discuss [number seventeen]." J.A. 14609. Nonetheless, when Stamps.com requested to add additional claims, it did not even attempt to make a good cause showing. The district court did not abuse its discretion in refusing to allow the additional claims.

II

We next consider the district court's ruling as to the invalidity of the fifteen asserted claims. The district court held that the asserted claims of the '991 and '777 patents were obvious over a combination of prior art, including the Tygar-Yee article. That article was asserted as § 102(b) prior art. Section § 102(b) provides, in relevant part, that an invention is not patentable if it was "described in a printed publication" more than one year prior to the filing date of the application from which the patent issued. 35 U.S.C. § 102(b). A prior art reference cannot constitute a "printed publication" under §102(b) if it has not been made "publicly accessible." *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). That inquiry focuses on the reference's accessibility to the "public interested in the art." *Id.* Stamps.com contends that the Tygar-Yee article should not have been treated as § 102(b) prior art because it was not publicly accessible.

We hold that the Tygar-Yee article was publicly accessible. The Tygar-Yee article, dated March 1, 1993, was written by Tygar and Yee and is entitled "Cryptography: It's Not Just for *Electronic* Mail Anymore." J.A. 6416–39 (emphasis in original). This article was sponsored by the United States Air Force, a Presidential Young Investigator Award, and Motorola, Inc. In an expert declaration submitted by Tygar in this case, he listed the Tygar-Yee article as prior art, J.A. 7951, and stated that he understood that "prior art consist[s] of publications . . . dated before the invention or more than one year before the filing of the patent application," J.A. 7961. Other evidence confirmed the public availability of the article. For example, the article was catalogued by Carnegie Mellon University and listed as available on its indexed website in 1993 as "CMU-CS-93-107.ps.Z." This document was listed as "last modified" on May 8, 1993. J.A. 10964.

Significantly, that date is several weeks after the date appearing in the article itself, suggesting that the website was not simply parroting the date appearing in the article. Moreover, Carnegie Mellon's website is a public forum where leaders in the field of computer science and other related fields certainly would have had access to the Tygar-Yee article. The paper was additionally cited in a second paper presented by Tygar and Yee in 1994, and Stamps.com itself identified the Tygar-Yee article as bearing a 1993 date in an information disclosure statement filed in connection with another patent that is currently not in suit.

Stamps.com did not submit any evidence to rebut the evidence that this paper was published in 1993. Thus, no genuine issues of material fact remain as to whether the article was publicly available more than one year prior to the filing dates of the '991 patent (October 2, 1996) and the '777 patent (July 15, 1998). The district court did not err in treating the Tygar-Yee article as § 102(b) prior art.

## III

The district court also did not err in finding claims 7 and 42 of the '991 patent obvious over the Tygar-Yee article. Claim 7 depends from claim 1, which recites:

> [A] closed metering system for transferring a value from a portable processor device having representative value stored therein coupled to a first processor-based subsystem to selected ones of a plurality of affiliated individual processor-based subsystems via a communication link coupling said first subsystem and said selected affiliated subsystem, said closed metering system comprising: . . . means, executing at least in part on the second subsystem, for transferring a predetermined amount of said representative value from

the portable processor via the communication link to said second subsystem.

'991 patent, col.28 ll.38–53. Claim 7 adds to claim 1 "means . . . for queuing requests from other ones of the affiliated subsystems, the requests being communicated via the communication link, the requests seeking transfer of individual predetermined amounts of the representative value from the portable processor." *Id.* col.29 ll.7–13.

Claim 42 depends from claim 40. Claim 40 recites:

A method for transferring a pecuniary value from a portable memory device coupled to a first general purpose processor-based system to a second general purpose processor-based system via a communication link, . . . said method comprising the steps of: . . . . printing, by said second system, an indicia having said pecuniary value.

*Id.* col.31 ll.28–44. Claim 42 adds to claim 40 a step of "queuing information communication between said first system and a plurality of processor-based systems, the information communication comprising requests by ones of the plurality of systems for pecuniary value from said portable memory." *Id.* col.31 ll.51–55.

The district court found that the Tygar-Yee article taught "transferring value from the 'first subsystem' (e.g., a home PC or postage meter) to 'affiliated systems' (e.g., USPS network) via a communications link," as required by claim 7. *Stamps.com*, slip op. at 19.

Stamps.com argues, inter alia, that Tygar-Yee does not disclose such a system because Tygar-Yee requires the user to recharge their electronic postage meter "by phone, using credit card numbers or direct electronic funds transfer from payment." J.A. 9598. Thus, according to Stamps.com, Tygar-Yee does not disclose a "USPS net-

work" because the transfer comes from a bank account and not from a PC storage device connected to the USPS network. Claim 7, however, is not restricted to communication with a USPS network. It only requires that value be transported from a "first subsystem" to "affiliated systems" via a communications link. A transfer from a bank account, as allegedly disclosed in Tygar-Yee, could certainly be considered to be part of an "affiliated system."

Stamps.com also argues that the Tygar-Yee article did not disclose a "queuing" means[1] or a "queuing" step as required, respectively, by claims 7 and 42. Nevertheless, Tygar-Yee teaches that its secure coprocessors *can* handle concurrent transactions from multiple workstations even if "users are unlikely to require *many* concurrent transactions." *See* J.A. 6428 (emphasis added).

In addition, Stamps.com argues that claims 7 and 42 teach a "download 44 cents-print 44 cents" usage pattern that is very different from the "download 50 dollars, print 44 cents" bulk-refill pattern allegedly disclosed in the Tygar-Yee article. Appellant's Br. 25. Because this argument was not properly raised below, it is not properly before us on appeal. *See, e.g.*, *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

---

[1]    Stamps.com argues that the district court erred when it failed to construe the means-plus-function limitations of various asserted claims in the course of its obviousness inquiry. After closely examining Stamps.com's arguments, we conclude that Stamps.com suffered no prejudice from the district court's failure to identify corresponding structure for each of the contested means-plus-function limitations because the structure disclosed in the asserted prior art was substantially identical to the structure identified in the specifications.

We therefore find no error in the district court's conclusion that claims 7 and 42 of the '991 patent are obvious over the Tygar-Yee article

## IV

Stamps.com argues that the district court erred in not considering the secondary considerations it offered to rebut arguments that the asserted claims of the '991 and '777 patents were obvious. These secondary considerations included a showing of expert skepticism and commercial success. However, Stamps.com did not demonstrate the requisite "nexus between the merits of the claimed invention" and the "evidence of secondary considerations." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008) (quoting *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000)); *see also In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (holding that the patentee's proof must show "that the sales were a direct result of the unique characteristics of the claimed invention"). Given the strong showing of obviousness, we find that the evidence of secondary considerations was inadequate to overcome the legal conclusion that the contested claims would have been obvious. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

## V

The district court found claim 76 of the '991 patent invalid over Tygar-Yee, citing the expert declaration of Tygar. However, Stamps.com's expert, Patrick McDaniel, concluded that the Tygar-Yee article did not disclose the "blind passing of data between the processors," as required by claim 74, on which asserted claim 76 depends. Claim 74 recites, in relevant part:

transferring said predetermined amount of monetary equivalent value from the second system to the refreshable memory device coupled to said first system via said communication link, said *predetermined amount of monetary equivalent value being passed blindly by said first system from said second system to said refreshable memory device.*

'991 patent, col.34 ll.25–31 (emphasis added). The district court construed "passed blindly" to mean "to pass information, without interpreting it to determine whether to pass it along to its destination." Claim Construction Order, *Stamps.com, Inc. v. Endicia, Inc.*, No. CV 06-7499 (C.D. Cal. June 15, 2009).

By way of illustration, the "second system" in one embodiment could be the computer system at a post office. The refreshable memory device could be a postage dispenser, which is coupled to a "first system," such as a user's PC. *See* '991 patent, col.11 ll.56–60 ("Typically, a user will buy a portable postage dispensing device 18, which could contain a quantity of postage, included with a copy of the E-STAMP program. The user will then install the E-STAMP program on the user's host processor-based system 10."). In order to replenish the postage dispenser, claim 74 requires the post office to send postage credit to the postage dispenser via the PC. *See id.* col.34 ll.25–31. The PC must receive the postage credit from the post office and blindly pass the information to the postage meter. *See id.* col.21 ll.1–7 ("[W]here [first system] remains a part of the communication bus between [second system] and the postage [dispenser], such commands must pass through [the first system]. The commands may be handed blindly to the postage [dispenser] by the E-STAMP program operating on system 10."). In this embodiment, the PC must pass the postage credit without

interpreting this information to determine whether to pass it along to the postage meter.

Stamps.com now argues that summary judgment of obviousness should not have been granted because there is a factual dispute as to whether "pass[ing] blindly" was disclosed by Tygar-Yee. No such factual dispute exists because Tygar-Yee clearly disclosed passing blindly a "predetermined amount of monetary value." '991 patent, col.34 ll.29–30. Tygar-Yee disclosed a "secure coprocessor," (e.g., postage dispenser) that could be "added to a computer." J.A. 9591. A secure coprocessor ensures that data about postage transactions can be protected from attacks by computer hackers. By storing the information in a separate secure coprocessor, the information is not vulnerable even when the PC is under attack. *See, e.g.*, J.A. 9590 (noting that when information about postage transactions is stored on a PC, "[an] adversary may replace the memory subsystem in the computer with dual ported memory, and just read the [cryptographic] keys as they are used").

Tygar pointed out that the Tygar-Yee article described *encrypting* postage information to protect against attacks so that a PC could pass the funds from a post office to a "secure coprocessor" without interpreting the information: "[A]ll interpretation of the monetary equivalent value [postage credit] is performed inside the secure coprocessor and not by the PC to protect against fraud. . . . Thus, the funds transferred to the secure coprocessor from the post office, are encrypted and not interpreted until received by the secure coprocessor—i.e., the PC passes the [postage credit] to the secure coprocessor blindly." J.A. 8059. Indeed, the PC does not contain the keys to encrypt or decrypt the postage information— these keys reside in the secure coprocessor and the post office computers.

McDaniel countered that "[t]he mere use of encryption does not say anything about how data is passed." J.A. 10411. McDaniel's testimony, however, is inconsistent with a proper understanding of the pertinent claim language. The specification of the '991 patent makes clear that the reference to the "predetermined amount of monetary equivalent value being passed blindly" forecloses decryption of the "monetary equivalent" data. Claim 76 requires only that the "monetary equivalent value" be "passed blindly." This does not preclude the recited "first system" from interpreting *any* information from the "second system" that might be used to redirect the encrypted data to the "refreshable memory device." As noted, the Tygar-Yee article discloses a system in which the "first system" does not decrypt the "monetary equivalent" data that is sent from the "second system," but determines from the package of information that includes the encrypted data that the data should be forwarded to the "refreshable memory device." Accordingly, we hold that Tygar-Yee clearly teaches the blind passing of monetary equivalent data between the processors, and there is no genuine issue of material fact as to whether claim 76 of the '991 patent would have been obvious.

## VI

The district court found claims 3, 50, and 63 of the '777 patent obvious over the Tygar-Yee article and the Lewis '565 patent, concluding that the Lewis '565 patent was § 102(a) prior art. Section 102(a) provides that a person is not entitled to a patent if "the invention was . . . patented . . . in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). Section 102(g) contains the basic rule for determining priority. *Id.* § 102(g); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). This section provides that "[a] person shall be entitled to a patent

unless . . . the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). Priority of invention "goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Mahurkar*, 79 F.3d at 1577. A showing that a patent was conceived at an earlier date and reduced to practice with reasonable diligence is called an effort to swear behind an earlier patent. *See, e.g.*, *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1327 (Fed. Cir. 2002).

Therefore, "if a patentee's invention has been made by another, prior inventor who has not abandoned, suppressed, or concealed the invention, § 102(g) will invalidate that patent." *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001). The Lewis '565 patent was filed on February 13, 1998, and constitutes § 102(a) prior art as long as the '777 patent was not conceived at an earlier date and reduced to practice with reasonable diligence. Stamps.com argues that the Lewis '565 patent could not be § 102(a) prior art because the '777 patent had an earlier conception date, or that, at a minimum, a genuine issue of material fact remains as to the conception date of the '777 patent.

At issue then is the '777 patent's date of conception. Conception is the formation, in the mind of the inventor, of "a definite and permanent idea of the complete and operative invention . . . . The idea must be 'so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'" *Mahurkar*, 79 F.3d at 1577 (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)).

In order to show that the subject matter of the '777 patent had been invented before the February 13, 1998, filing date of the Lewis '565 patent, Stamps.com offered two pieces of evidence to swear-behind the reference: (1) a September 24, 2009, declaration from Martin Pagel, the co-inventor of the '777 patent ("First Pagel Declaration"); and (2) a corroborating "Executive Status Report" dated March 19, 1998, discussing activity allegedly connected with the development of the '777 patent ("March Status Report").

In rejecting this evidence as insufficient to establish prior conception, the district court stated that "[p]laintiff has not been able to prove by clear and convincing evidence . . . that the invention claimed in the '777 patent was conceived before its July 15, 1998, filing date." J.A. 26. The district court erred in placing the burden of proof on the patentee.[2] Though the patentee has the burden of production in antedating a reference, the burden of persuasion, by clear and convincing evidence, remains with the party that challenges an issued patent's validity.

---

[2]    Endicia cites *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993), for the proposition that Stamps.com had the burden of showing conception and reduction to practice. However, *Price* is an interference action in which the priority dates of multiple patent applications were challenged. *Id.* at 1189. Patent applications, unlike patents that have been reviewed and issued by the PTO, deserve no presumption of validity in interference proceedings. *See* 35 U.S.C. § 282. Accordingly, the burden of proof in interference actions is the lower preponderance of evidence standard, and the burden is generally assigned to the junior party (the party that entered the interference action with a later filing date). *See* 37 C.F.R. § 1.657. In contrast, a party asserting invalidity in a district court always bears the burden of proof by clear and convincing evidence. *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994).

*Mahurkar*, 79 F.3d at 1576 ("By challenging the validity of the [patent], [the alleged infringer] bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the [reference] as [§ 102(a)] prior art.").

However, the patentee here did not meet its burden of production in antedating the Lewis '565 patent. The First Pagel Declaration claims that "the conception of the invention . . . occurred in the second half of 1997, and certainly well before January 1, 1998." J.A. 10388. Nonetheless, an inventor, such as Pagel, claiming prior conception must proffer evidence corroborating his testimony. *See Mahurkar*, 79 F.3d at 1577. "This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Id.*; *see also Eibel Process Co. v. Minn. & Ontario Paper Co.*, 261 U.S. 45, 60 (1923); *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275, 284–85 (1892); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995). The requirement for the corroboration of inventor testimony applies to efforts to swear behind a prior art reference. *See, e.g.*, *Mahurkar*, 79 F.3d at 1577.

Here, the primary evidence offered to corroborate the Pagel Declaration is the March Status Report. Pagel claims the report "indicates that in March of 1998, [Stamps.com] was in possession of a unique hardware device ('[button] array') that . . . was manufactured at our request by Dallas Semiconductor." J.A. 10389. Because the manufacturing process would have taken many months, Pagel claims that conception of the "button array" must have "occurred prior to January 1, 1998." J.A. 10389.

However, it is unclear how the "button array" is related to the subject matter of the '777 patent. The March Status Report makes only opaque and incomprehensible references to a "button array" and "iButton." These references hardly show that the conception for the '777 patent was "so clearly defined . . . that only ordinary skill would be necessary to reduce the invention to practice." *See Mahurkar*, 79 F.3d at 1577. Indeed, Tygar's expert testimony demonstrates that one of skill in the art would not have comprehended the status report:

> [The March Status Report] is written in a way that prevents a person of ordinary skill in the art from knowing the particular subject matter to which it relates; its cursory language renders much of [the status report] unintelligible. I could not identify any portion of [the status report] that a person of ordinary skill in the art of computer science would recognize as a clear reference to the particular invention covered in the claims of the '777 patent, let alone a complete disclosure of that invention.

J.A. 10922–23. Stamps.com offered no contrary expert evidence. There is no evidence that the March Status Report corroborates Pagel's declaration.

Additionally, Stamps.com argues that the district court abused its discretion in not considering evidence in a reply brief to cross-motions for summary judgment that it had submitted on October 5, 2009. This evidence included a second declaration by Pagel ("Second Pagel Declaration") and a corroborating declaration ("Desai Declaration") by Manish Desai, an engineer who was supervised by Pagel at Stamps.com's predecessor company. Because these declarations were raised for the first time in a reply brief to which Endicia did not have an

opportunity to respond, we hold that the district court acted within its discretion when it did not consider these supplementary declarations. *See In re Cygnus Telecomms. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1351–53 (Fed. Cir. 2008) (applying regional circuit law in deciding the admissibility of evidence that was not included in motions for summary judgment); *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (Fed. Cir. 2007) (holding that issues raised for the first time in a reply brief are generally considered waived, but making an exception where appellee was given an opportunity to respond); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (holding that a district court "need not consider arguments raised for the first time in a reply brief").[3]

Because Stamps.com failed to meet its burden to produce evidence establishing prior conception, we hold that there is no genuine issue of material fact regarding the conception of the '777 Patent, and we affirm the district court's holding that the '777 Patent was obvious over the Lewis '565 patent and the Tygar-Yee article.

VII

---

[3]     Stamps.com argues that *Fair Housing Council v. Riverside Two*, 249 F.3d 1132 (9th Cir. 2001), requires the consideration of the Second Pagel Declaration and the Desai Declaration. However, in *Fair Housing*, "the district court erred by failing to review the evidence that [appellants] had submitted in support of their *motion* for summary judgment as evidence in opposition to [appellee's] motions for summary judgment." *Id.* at 1135 (emphasis added). The Ninth Circuit explained that "the district court was required to review the evidence properly submitted in support of [appellants'] *motion . . . .*" *Id.* (emphasis added). Here, the Second Pagel Declaration and the Desai Declaration were both submitted in a reply brief and not in the opening motions for summary judgment.

The district court held that claims 13, 50, and 89 of the '214 patent were invalid as anticipated in view of the Ogg-Chow '406 patent, which was cited as § 102(a) prior art. To swear behind the Ogg-Chow '406 patent (filed October 16, 2000), Stamps.com offered a third declaration from Pagel ("Third Pagel Declaration"), which stated that the "conception of the invention recited in the '214 Patent occurred at least by November of 1998, and certainly well before October of 1999." J.A. 10394. As corroboration, Stamps.com offered a Status Report dated November 3, 1998 ("November Status Report"). The November Status Report allegedly documented the development of a "vPSD" or "virtual postage security device," which purportedly referred to the "user data files" in claim 1 of the '214 patent which "are loaded into . . . portable memory to thereby configure said portable memory for use in serving a corresponding demand [for postage]." '214 patent, col.29 ll.65–67; *see also id.* col.20 ll.15–60. Stamps.com claimed that the November Status Report corroborated the fact that Pagel was in possession of the vPSD system by at least November 1998.

The November Status Report suffers from the same defects as the March Status Report with respect to the '214 patent. Like the March Status Report, the November Status Report is completely incomprehensible and fails to sufficiently corroborate the inventor testimony in the Third Pagel Declaration. Stamps.com again offered the Second Pagel Declaration and the Desai Declaration as corroborating evidence. As discussed in the previous section, the district court did not err in declining to consider those declarations. Because we hold that Stamps.com failed to bear its burden of production in antedating the Ogg-Chow '406 patent, there are no genuine issues of material fact as to whether the Ogg-Chow '406 patent was § 102(a) prior art. Accordingly, we affirm

the district court's holding that the '214 patent is anticipated by the Ogg-Chow '406 patent.

## VIII

The district court held that claim 23 of the '568 patent, as a means-plus-function claim, was indefinite for failing to disclose a corresponding structure for "means for determining a value of said transaction associated with two or more of said plurality of providers utilizing ones [sic] of said transaction parameters." '568 patent, col.34 ll.35–37. The pertinent part of claim 21, from which claim 23 depends,[4] recites:

> A general multi-purpose processor-based system for authorizing a desired transaction to be conducted utilizing a particular provider, wherein information with respect to said desired transaction as conducted by each of a plurality of providers is presented for selection of said particular provider, said system comprising: . . .
>
> *means for determining a value of said transaction associated with two or more of said plurality of providers utilizing ones [sic] of said transaction parameters*;
>
> *means for presenting each of said determined values for comparison . . . .*

---

[4]    Claim 23 recites:
The system of claim 21, wherein said means for determining desired transaction parameters comprises:

    means for accepting information associated with said transaction parameters from a general purpose computer program operating on said general multi-purpose processor-based system.

'568 patent, col.34 ll.49–54.

*Id.* col.34 ll.27–39 (emphasis added). Using this system, a user could enter certain "transaction parameters" (e.g., ZIP code, weight, mail class) and the system would determine the costs of the transaction for each shipping provider (e.g., USPS and FedEx) and present this information to the user for comparison. *Id.*

In *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009), we held that, "if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language." (citation and quotation omitted); *see* 35 U.S.C. § 112, ¶ 2. "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard*, 574 F.3d at 1382 (quoting *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)).

In *Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 521 F.3d 1328, 1333 (Fed. Cir. 2008), we held that a "computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm." (quoting *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005)). In a means-plus-function claim in which the disclosed structure is a computer, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). "In software cases, . . . algorithms in the specification need only disclose adequate defining structure to render the bounds of

the claim understandable to one of ordinary skill in the art." *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).

Before considering whether there was adequate disclosure of a corresponding structure, we must construe the claim language describing the function. In claim 21 of the '568 patent, the claimed function is a "means for determining a value of said transaction associated with two or more of said plurality of providers utilizing ones [sic] of said transaction parameters." '568 patent, col.34 ll.35–37. The district court appears to have construed the function to require a means for "determin[ing] the value [for the shipping transaction] (i.e., a program that links to the shipping companies' websites or provides other means of ascertaining the shipping companies' data)." *Stamps.com*, slip op. at 24. Stamps.com contends that the district court misconstrued the function and that "the determination [of value for a shipping provider] is most naturally understood to be the performance of this calculation rather than the process of obtaining such algorithms from the shipping companies." Appellant's Br. 46. We agree that the contested means-plus-function claim should be construed as requiring a means for *calculating* the shipping costs, rather than a means for *accessing* or *obtaining* algorithms for such calculations from the shipping providers.

We turn to whether the specification discloses a corresponding structure for a means for calculating the shipping costs. Stamps.com identified the E-STAMP program as the corresponding structure for these calculations: "The E-STAMP program will automatically incorporate the . . . entered [transaction] parameters—weight, class, zone—in order to correctly calculate the correct postage or credit transaction authorization to print in conjunction with the postage indicia." J.A. 10427. Stamps.com appears to

contend that, given certain transaction parameters (e.g., weight, class, zone), one of skill in the art would know how to calculate the shipping costs.

Though the E-STAMP program may constitute the structure for the contested means, it is not sufficiently described for one of skill in the art to implement it. It is not enough that a person of skill in the art can identify a structure to determine the transaction value. As we stated in *Blackboard*:

> [Such an argument] conflates the definiteness requirement of section 112, paragraphs 2 and 6, and the enablement requirement of section 112, paragraph 1. The fact that an ordinarily skilled artisan might be able to design a program to create an access control list, based on the system users' predetermined roles goes to enablement. The question before us is whether the specification contains a sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the art could devise some means to carry out the recited function.

574 F.3d at 1385. We must determine whether a skilled artisan would have understood the specification to encompass the necessary program and could have implemented the program—not simply whether he could have written the program. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003). "It is not proper to look to the knowledge of one of skill in the art apart from and unconnected to the disclosure of the patent." *Id.* Here, the calculation of shipping value appears to involve a complex interaction of zone variables, weight variables, and class variables. There is no disclosure of the actual algorithms necessary to calcu-

late the transaction value, nor is there any disclosure that these algorithms involve only simple arithmetic. The failure to provide such an algorithm in the specification renders claim 23 of the '568 patent invalid as indefinite.

## IX

The district court determined that claim 17 of the '451 patent and claims 32 and 39 of '808 patent were obvious over three prior art references: Word 95, DAZzle, and AddressMate. The '451 patent claims a method of configuring a printer to print postage indicia near the margins of an envelope. Because standard printers typically differ in the way envelopes are fed into the printer, it is necessary for software programs to query databases for information about specific printers. Claim 17 of the '451 patent recites:

> The system of claim 16 wherein the means for querying one or more databases to determine the set up data for the user's printer comprises means for querying one or more databases to determine a *printer offset* as a function of how the print media is fed into a printer.

'451 patent, col.24 ll.32–36 (emphasis added). Thus, claim 17 requires that the system query databases to determine how to set up a printer to use a specified "printer offset" from the edges of an envelope. The '808 patent describes a method and system for printing information on print media, such as envelopes. Claims 32 and 39 are directed to determining a "*printer offset* as a function of how . . . one or more patterns print on a test envelope" and "determining the *offset* for the selected printer from a printer database having information on one or more printer drivers." '808 patent, col.25 ll.21–25 & col.25 ll.57–62 (emphases added). Both the '451 and '808 patents define a printer offset as "a variable dependent upon how an

envelope is fed into a printer. . . . [T]he client software uses the printer offset to locate the envelope image within the printable region . . . ." '451 patent, col.13 ll.1–10; '808 patent, col.13 ll.20–23.

Each party offered its own expert testimony as to whether the prior art disclosed a printer offset. Endicia relied mainly on the expert declaration of Stuart Soffer, who took screenshots of these programs to show how a "printer offset" was queried in the Windows Registry (a database that, among other things, maintains information about printer drivers). The district court, relying on Soffer's declaration, determined that

> Word 95 provides the user with the option of selecting a feed tray position and, once the feed tray position is selected, the information is stored in Windows Registry, which can be queried later to determine printer offset. Similarly, [DAZzle] allows a user to select how an envelope is fed into a printer and saves that feed option in the Windows Registry or in a layout file, which can be queried later to determine a printer offset. AddressMate also allows a user to select how an envelope is fed into a printer and to save that option in template layout files.

*Stamps.com*, slip op. at 29–30 (internal citations omitted).

We think that Word 95, by itself, is sufficient to render claim 17 of the '451 patent and claims 32 and 39 of the '808 patent obvious. Word 95 has been publicly available since as early as 1995, well before the August 30, 1999, filing date of the provisional application for the '451 and '808 patents. Word 95 also discloses the printing of envelopes and labels under the "Envelopes and Labels" function of the "Tools" menu. J.A. 7468. In order to obtain printer feed information for a specific printer,

Word 95 can query the Windows Registry. For example, Soffer appears to have identified the "EnvFeed value" in the Windows Registry as a value representing the printer offset: "As the printer feed option changes, the Registry Key 'EnvFeed' changes for each of the envelope feed options." J.A. 7471. Word 95 then works with the user's printer to print information displayed onto the envelope or label in accordance with the printer configuration data. Soffer's declaration would support a finding that Word 95 discloses every element of the disputed claims.

On appeal, Stamps.com argues that Soffer's declaration fails to support a finding that the prior art disclosed a "printer offset" because Soffer did not establish the behavior of the prior art software as it existed before the priority date of the '451 and '808 patents. In particular, Stamps.com contends that Soffer ran the prior art software on a non-prior art operating system with non-prior art printer drivers.[5] This is argued to be problematic because the non-prior art printer drivers could themselves have supplied the purported printer offsets, rather than the Windows Registry in Word 95. However, as Stamps.com concedes, this argument was not made below and cannot properly be considered on appeal. *See Sage Prods., Inc.*, 126 F.3d at 1426. We therefore decline to address this unsupported allegation.

Moreover, Stamps.com offered a declaration from McDaniel, to challenge Soffer's declaration. With regard to the '451 patent, McDaniel stated:

85. For Word 95, [Endicia's] expert cites the Windows Registry parameters "printMaxXExtent,

---

[5] Stamps.com notes that the tests that Soffer relied on were run on an HP Photosmart 2570 printer, which was purportedly developed after the priority date of the '451 patent.

> printMaxYExtent, print MibXExtent [sic] and printMinYExtent" as examples of "printer offset." *. . . None of these parameters is a "printer offset" as defined in the '451 Patent.*
>
> 86.   For DAZzle, [Endicia's] expert cites the Windows Registry once again, but *fails to point to any data that represents a "printer offset" as defined in the '451 Patent.*
>
> 87.   For AddressMate, [Endicia's] expert cites the "vertical and horizontal offsets" stored in a template layout (TPL) file. . . . However, *these vertical and horizontal offsets are not a "printer offset" as defined in the '451 Patent.*

J.A. 10416–17 (emphases added). These conclusory opinions fail to raise a genuine issue of fact. *See Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373–74 (Fed. Cir. 2008) (finding an expert report insufficient to raise a genuine issue of fact where the expert "merely lists a number of prior art references and then concludes with the stock phrase 'to one skilled in the art it would have been obvious to perform [the claimed methods]'"). McDaniel failed to explain the basis for his conclusions that the printer offsets, as defined in the '451 patent, were not disclosed in the prior art. Nor did McDaniel address the printer offset issue with regard to claims 32 and 39 of the '808 patent.

Stamps.com has thus failed to offer sufficient evidence of non-obviousness to raise a genuine issue of material fact. The district court was correct to hold that claim 17 of the '451 patent and claims 32 and 39 of the '808 patent were obvious over Word 95, DAZzle, and AddressMate.[6]

---

6    In addition, Stamps.com argues there was a genuine issue of material fact as to whether Word 95, DAZzle, and AddressMate disclosed "mapping an image onto a

IX

The district court found that claim 7 of the '597 patent, claim 35 of the '980 patent, and claim 32 of the '808 patent were obvious over the DAZzle software program and a combination of other prior art.[7] These claims all

---

virtualized sheet" as required by claims 32 and 39 of the '808 patent. A "virtualized sheet," is a preview "of the information [to be printed] contained within a printable region." '808 patent, col.3 ll.1–2. Endicia's expert presented claim charts showing how Word 95, DAZzle, and AddressMate disclosed the ability to preview an image of an envelope or letter before printing it. In response, Stamps.com offered McDaniel's declaration, which simply stated that "None of these programs is capable of 'mapping an image onto a virtualized sheet' as described in the '808 patent." J.A. 10418. We conclude that McDaniel's conclusory opinion fails to raise a genuine issue of material fact. *See Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373–74 (Fed. Cir. 2008).

[7] Asserted claim 7 of the '597 patent provides: "The system set forth in claim 6 further including: means for transferring said *printed postage* and *indicia* from said transfer medium to a mailing envelope." '597 patent, col.18 ll.7–9 (emphases added).

Asserted claim 35 of the '980 patent provides: "The system of claim 34, wherein at least one of said generating means includes: means for selecting one of a plurality of graphical configurations of a *postage indicia*; and means for personalizing said selected graphical configuration." '980 patent, col.25 ll.39–44 (emphasis added).

Asserted claim 32 of the '808 patent provides:

The system of claim 30 wherein the means for determining said printer offset comprises means for sending a print job having one or more patterns to said printer and means for determining said printer offset as a function of how said one or more patterns print on a test envelope.

contain the term "postage indicia" or "postal indicia." The district court construed "postage indicia" as: "A printed postage designation on a mail piece or label that includes the *amount of postage*, and may include an arbitrary or fanciful graphic configuration and/or a machine readable encrypted message." J.A. 42 (emphasis added). The district court construed "postal indicia" as "postal markings including but not limited to the *amount of postage*, and FIM barcodes and/or two-dimensional barcodes, printed or imprinted on a mail piece or label." J.A. 46 (emphasis added).

On appeal, Stamps.com argues that both "postage indicia" and "postal indicia" must include actual postage and not just a representation of postage value. Stamps.com argues that DAZzle does not require the printing of actual postage and therefore does not render the claims obvious. Stamps.com is partly correct. DAZzle does not calculate or print actual postage. It merely allows the printing of a "postage box indicating the amount of postage due in the upper right corner of your mail piece" (i.e., a placeholder that says "$0.32 Place First-Class Postage Here"). J.A. 7424, 7434.

---

'808 patent, col.25 ll.21–25. And claim 30 of the '808 patent, from which claim 32 depends, recites:

> A system for printing *postal indicia* comprising: means for determining a printer offset as a function of how an envelope is fed into said printer; means for mapping an image onto a virtualized sheet; means for generating a print job for the virtualized sheet, wherein the image is located within a printable region of the virtualized sheet as a function of said printer offset; and a printer for printing said *postal indicia* onto said envelope.

*Id.* col.25 ll.9–18 (emphases added).

The term "postage indicia" in claim 7 of the '597 patent and claim 35 of the '980 patent does not appear to require the printing of actual postage.[8]  However, based on the specification of the '808 patent, Stamps.com argues that the term "postal indicia" in the '808 patent does require the printing of actual postage.  *See, e.g.*, '808 patent, col.6 ll.31–34 ("The *printed indicium* appears as a two-dimensional bar code that includes a unique serial number, mail delivery point information, and the *amount of postage*.") (emphases added).  But even assuming that both "postage indicia" and "postal indicia" require the delivery of actual postage, it would have been obvious to one of skill in the art to combine the DAZzle reference

---

[8]    The use of "postage indicia" in the '597 patent clearly differentiates between "postage" and "postage indicia."  Where "postage" requires actual postage value, "postage indicia" is merely a graphical designation that does not require actual postage value.  Claim 6 of the '597 patent, from which asserted claim 7 depends, treats "postage" and "[postage] indicia" as separate claim elements, reciting a "system . . . wherein said printing means prints said created *postage* and *postage indicia*."  '597 patent, col.18 ll.4–6 (emphases added).  Asserted claim 7 adds: "The system set forth in claim 6 . . . including[ ] means for transferring said printed *postage* and *indicia* from said transfer medium to a mailing envelope."  '597 patent, col.18 ll.7–9 (emphases added).  The summary of the '597 patent similarly distinguishes between "postage" and "postage indicia," disclosing a "program that can generate customized greeting cards to allow the customer to *automatically calculate the correct amount of postage* for the customized card, and to *print that postage*.  This system can also generate an addressed envelope with a *personalized postage indicia* printed thereon."  '597 patent, col.2 ll.35–39 (emphases added).  Finally, the "stamp indicia 1508" depicted in FIGS. 15A and 15B of the '597 patent and the '980 patent do not show actual postage.  '597 patent, Figs. 15A, 15B; '980 patent, Figs. 15A, 15B.

with the Whitehouse '562 patent, which discloses the printing of actual postage value. *See* '562 patent, col.11 ll.61–65 (disclosing a computer system with a non-volatile memory for controlling a printer to print the actual postage amount on mail pieces: "The sample postage mark . . . express[es] the fundamental information required by the [USPS]—city/state of origin, date of issue, *amount of postage*, and meter number.").

Stamps.com, however, argues that DAZzle and the Whitehouse '562 patent cannot be combined because the Whitehouse '562 patent teaches away from certain features of DAZzle. Specifically, Whitehouse appears to teach a postage mark with a "graphical emblem similar in ways to the artistic and thematic content expressed in the regular stream of USPS stamp 'new issues.'" '562 patent, col.12 ll.31–33. This graphical emblem is stored in encrypted "hidden files" and used as an "industry standard" in order to "frustrate and control counterfeiting and/or unauthorized production of the postage mark." *Id.* col.12 l.39 & ll.49–50. Stamps.com contends that allowing users to choose their own "graphical emblems," as taught by the DAZzle software, would defeat the anti-counterfeiting objectives of the Whitehouse '562 patent. Thus, Stamps.com argues that the Whitehouse '562 patent would teach away from giving users a choice of graphical configurations. This argument is unavailing. A reference does not teach away when it merely expresses a general preference for an alternative invention. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Here, the use of the graphical emblem as an auto-counterfeiting measure was described as an "alternative embodiment" that was entirely optional and not required by the Whitehouse '562 patent. '562 patent, col.12 l.28 & ll.46–48. Moreover, the '562 patent explicitly teaches another embodiment using the patent in conjunction with the "Envelope Manager"

program, an early version of the DAZzle program.   *Id.* col.1 ll.19–26, col.4 ll.4–8, 15–23, & 56–57.

Stamps.com also contends that the term "postage in- dicia" should have been construed to require "arbitrary or fanciful graphical configurations."   Appellant's Br. 15–16. We agree that the district court erred in construing these graphical configurations as optional.   However, the dis- trict court correctly found that the DAZzle reference clearly disclosed such graphics.   *See, e.g.*, *Stamps.com*, slip op. at 14 (explaining that DaZzle could depict a "Graphic Image" of "Happy Birthday Mom" with a birth- day hat and confetti).   Therefore, Stamps.com was not prejudiced by a construction that made the graphics optional.

We therefore affirm the invalidity of claim 7 of the '597 patent, claim 35 of the '980 patent, and claim 32 of the '808 patent as obvious over a combination of DAZzle and the Whitehouse '562 patent.

**AFFIRMED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**STAMPS.COM INC.,**
*Plaintiff-Appellant,*

v.

**ENDICIA, INC. AND PSI SYSTEMS, INC.,**
*Defendants-Appellees.*

---

2010-1328

---

Appeal from the United States District Court for the Central District of California in Case No. 06-CV-7499, Judge Otis D. Wright, II.

---

BRYSON, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I concur in the court's disposition of the nine asserted claims of the '214, '451, '568, '597, '808, and '980 patents. I also agree that the district court did not abuse its discretion in allowing Stamps.com to assert additional claims only upon a showing of need. In my view, however, the district court should not have entered summary judgment invalidating the six asserted claims of the '777 and '991 patents. I therefore dissent with respect to the affirmance of that portion of the district court's judgment.

The majority upholds the district court's conclusion that the Tygar-Yee article is prior art to the '777 and '991 patents. I do not agree that the evidence proffered by Endicia was sufficient to establish that the Tygar-Yee article was publicly accessible before the priority dates of those patents.

The Tygar-Yee article is dated March 1, 1993, but there is no evidence as to the date of its publication. The majority notes that the article was cited in a subsequent article by Tygar and Yee published in 1994. That citation, however, does not constitute evidence that the 1993 Tygar-Yee article was ever publicly accessible, particularly in light of the fact that the later article was written by the same authors. The majority also relies on a declaration by Dr. Tygar, the co-author of the Tygar-Yee article, stating that the article is prior art. Dr. Tygar's declaration, however, consists of a conclusory legal assertion and provides nothing by way of evidence in support of that assertion.

In the summary judgment proceedings, Endicia offered as an exhibit a printout of a webpage that an Endicia attorney identified as "a printout of Carnegie Mellon University's School of Computer Science archive report for the year 1993." The exhibit is entitled "Index of/anon/1993" and consists of a list of file names, file sizes, and the dates on which the files were last modified. Endicia claims that one of the files, "CMU-CS-93-107.ps.Z," represents the Tygar-Yee article. That file name lists a modification date of May 8, 1993. The majority characterizes the website as a "public forum," but the record contains no evidence that the webpage in the exhibit was accessible to the public or widely disseminated in 1993. *See In re Lister*, 583 F.3d 1307, 1211 (Fed. Cir. 2009) ("A reference is considered publicly accessible if

it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art[,] exercising reasonable diligence, can locate it."); *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1332-35 (Fed. Cir. 2009) (holding that an academic paper distributed among a limited set of professional colleagues is not a prior art publication).

The majority highlights the fact that Stamps.com identified the Tygar-Yee article as bearing a 1993 date in several information disclosure statements that it filed in 2000 in connection with other patents. It is well settled, however, that a patentee's inclusion of a reference in an information disclosure statement does not constitute an admission that the reference is prior art. 37 C.F.R. § 19.7(h); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 866 (Fed. Cir. 2010); *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1279 (Fed. Cir. 2003).

Finally, the majority states that Stamps.com submitted no evidence that the Tygar-Yee article was *not* published in 1993. Apart from the ordinary difficulty of proving a negative, it is well settled that, at the summary judgment stage, "the moving party must make a prima facie showing that it is entitled to summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). When the movant has the ultimate burden of proof on an issue, it must show that it is entitled to judgment, and if it does not do so, the non-moving party need not come forward with opposing evidence. *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006); 11 James Wm. Moore, *Moore's Federal Practice* ¶ 56.40[1][c] (2011 ed.) ("[T]he movant [with the burden of proof on the merits] must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence. . . . [T]he evidence

in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it.") In the context of a motion for summary judgment of invalidity, the burden is not on the patentee to present evidence that a reference is not prior art; instead, the party challenging the patent has the burden to make a prima facie showing that the reference was publicly accessible. Because Endicia failed to show that the Tygar-Yee article is prior art, I would hold that the district court erred in invalidating the six asserted claims of the '777 and '991 patents as obvious.